[No. C013400. Third Dist. Jan. 24, 1995.]

MUSIC ACCEPTANCE CORPORATION et al., Plaintiffs, Cross-defendants and Appellants, v.
DAN LOFING et al., Defendants, Cross-complainants and Appellants.

**COUNSEL**

Sedgwick, Detert, Moran & Arnold and Roger W. Sleight for Plaintiffs, Cross-defendants and Appellants.

Kemnitzer, Dickinson, Anderson & Barron and Roger Dickinson for Defendants, Cross-complainants and Appellants.

**OPINION**

**SPARKS, J.**—This case centers on the rights of a purchaser of a defective piano. Defendant and cross-complainant Dan Lofing (Lofing) purchased a Steinway grand piano from Sherman Clay & Co. (Sherman Clay), Steinway & Sons' (Steinway) Sacramento dealer, and received financing through Sherman Clay's finance company, Music Acceptance Corporation (MAC).[1] Lofing became disenchanted with his piano after a variety of problems with the instrument became apparent. When his complaints to Steinway and Sherman Clay were not resolved, Lofing stopped making payments to MAC. MAC sued Lofing and his cosigner, Yumi Sim Cooper, for breach of

---

[1] The parties agreed that Sherman Clay and MAC were to be treated as the same entity, and the jury was so instructed.

contract.[2] Lofing responded by filing a cross-complaint against MAC, Steinway, and Sherman Clay, alleging a number of causes of action, including violations of state and federal consumer protection laws.

The jury found in Lofing's favor on the cross-complaint, awarding him $8,550 against Steinway and $15,650 against Sherman Clay. However, the jury also found in MAC's favor on the complaint, awarding it $23,675 in damages, resulting in a net award to Lofing of $525. Lofing filed numerous motions for postjudgment relief, asserting the verdicts were inconsistent as a matter of law since MAC was subject to the same claims and defenses that had been successfully raised against Steinway and Sherman Clay. The court denied Lofing's motions.

On appeal, Lofing again asserts these verdicts are inconsistent and judgment must be entered in his favor on MAC's complaint. He also challenges the court's refusal to award him attorney fees, as well as the court's denial of his motion to tax costs. In a cross-appeal, Steinway contends there is no basis for the judgment against it, and MAC contends it was entitled to attorney fees. We reject the claims made in the cross-appeal and find Lofing's appeal meritorious. We shall therefore reverse the judgment entered in favor of MAC and remand for further proceedings on the question of attorney fees.

### FACTUAL AND PROCEDURAL BACKGROUND

Viewed in a light most favorable to the jury's verdicts, the evidence at trial revealed the following: Lofing is an accomplished pianist and makes his living as an accompanist and piano teacher. In early 1984, he began to look for a better piano for his personal use.[3] He went to Sherman Clay, the local distributor for Steinway pianos, but the few pianos on the showroom floor did not impress him. A sales person, Rita Misener, told him a Steinway promotional sale would be coming up soon and many more pianos would be available. Lofing left his name and address to be notified of this event.

The Steinway sale was held at Sherman Clay in early April 1984. Lofing attended a reception at the store, where he spoke to Misener, and David Reuben, a Steinway vice-president. Lofing told Reuben he had heard there

---

[2]Although Cooper is a party to this appeal, her role is limited to that of cosigner. For ease of discussion, we refer by name only to the principal party, Lofing.

[3]Lofing taught the great majority of his students on their own pianos in their own homes.

had been some problems with the bushings in Steinway grand pianos[4] but Reuben reassured him that the problems had been rectified. Lofing played 10 to 15 different pianos, and found a 7-foot model B Steinway grand piano whose tone he loved. Misener assured him the tone would become "larger and broader" over time, but that its basic "sweetness" would remain.

Lofing was unsure whether he could afford the piano, which was priced at $24,199.[5] Upon completing a credit application, he was told he would need a cosigner because his income was insufficient. Yumi Sim Cooper agreed to cosign the loan application and the financing was approved. The amount financed was $19,650.94, representing the purchase price plus sales tax, less a $6,000 allowance for a trade-in on Lofing's piano. The loan required 96 monthly payments of $338.20. In large, bold type it further provided: "Any holder of this consumer contract is subject to all claims and defenses which the debtor could assert against the seller of goods or services obtained pursuant hereto, or with the proceeds hereof."

The piano was delivered to Lofing's home the next week. He received a warranty from Steinway, which provided the company "will promptly repair or replace without charge any part of this piano which is found to have a defect in material or workmanship within five years" from the date of sale. Lofing was to contact the Steinway authorized dealer, i.e., Sherman Clay, or Steinway itself for any warranty service.[6] A Steinway booklet Lofing had been given stated: "The care of your Steinway will not be particularly time-consuming or expensive."

During the first month of ownership, Lofing noticed a deterioration in the action and tonal quality of the piano. He called Sherman Clay to request a tuning. Brad Larson, Sherman Clay's Steinway piano technician, tuned the instrument and sanded some parts, leaving sawdust around the piano. Within a few hours, the piano seemed out of tune again.

Four to five months later, the action remained stiff, and the tone was not what Lofing expected. Larson worked on the piano, but Lofing continued to notice a decline in the piano's tonal qualities. The piano sounded harsh, and

---

[4]As one piano technician explained, bushings are pieces of cloth that are glued into place to keep a controlled level of friction between the moving parts of the piano.

[5]Lofing believed he would be able to afford the payments through piano lessons. He taught his own students, and after purchasing this piano, also taught students referred by Sherman Clay, using studio space at the store. In his complaint, he alleged causes of action for fraud and negligent misrepresentation, asserting inter alia that Sherman Clay had promised to recruit a sufficient number of students to permit him to pay off his loan early. The jury found against Lofing on these claims.

[6]The sales contract included one year's service for the piano.

no longer had the sweet quality that first attracted him. The piano's touch became increasingly uneven, requiring differing amounts of pressure on different keys to produce the same sound.

Lofing lived with the problems for a while because he felt uncomfortable complaining to Sherman Clay while teaching students referred by the store. In January 1985, Larson again worked on the piano for several hours, tuning it, voicing the instrument, and reaming the bushings. Problems persisted. In December 1985, Larson made two attempts to fix the piano, and concluded the piano "[h]ad some problems" that needed to be discussed with the Sherman Clay manager.

By this point, the piano was deteriorating at "a geometric pace." Keys stuck, the pedals were not working properly, and the instrument developed a "twang." Larson attempted to repair these problems on several occasions in early 1986. Each visit lasted three to four hours and involved extensive work, but Larson's efforts were unavailing. Lofing described the piano's sound as "beating garbage can lids," and believed the piano's touch had been destroyed, ruining his technique. The dampers stuck, requiring him on one occasion to physically push the dampers down to stop the strings from vibrating.

In March 1986, Lofing met at Sherman Clay with the store's manager, Larson, and the division manager for Steinway. Lofing was assured that Steinway would take care of any problems. Larson stated that while he had never done a repair job of this size, he was sure he could handle it. Lofing left the meeting believing the problems would be resolved.

By April, however, nothing had happened, and Lofing contacted an attorney. He hired several technicians to inspect and report on the piano. They all agreed the piano suffered from major problems involving the key frame, strings, hammers, action and bridge. The piano was deemed to have so many deficiencies that it was "basically unplayable."

Lofing no longer had faith in Sherman Clay or Steinway, and he wrote to Steinway seeking to return the piano in exchange for a refund of his payments less a reasonable rental fee. In June 1986, Steinway sent its chief technician, Bill Garlic, to inspect the piano. He found the piano was in "terrible condition" and expressed his surprise that it had ever left the factory. He believed the piano would have to be completely rebuilt. He said he would have to repair the piano at the factory or give Lofing a new piano.

Each piano is a unique instrument. According to several piano technicians, the types of repairs contemplated were so extensive that the rebuilt piano

would no longer be the piano that Lofing had purchased, and might well have a completely different tone and touch. In July, after Garlic's inspection, Lofing renewed his request to return the piano and receive his money back.

Steinway first responded that it would either repair the piano to its original condition, or fly Lofing to New York to select a new instrument. Lofing refused this offer for a number of reasons. He wanted to find another piano he liked, not necessarily a Steinway. He was concerned because he had read articles suggesting an ongoing problem with bushings in Steinway pianos, and he did not want to have to continue his relationship with Sherman Clay or Brad Larson, the Sacramento Steinway representatives and technician.

Steinway wrote another letter agreeing to refund Lofing's purchase price, less an offset for the rental value of the piano during this period of time. Steinway assigned a rental value of $566.98 per month, resulting in Lofing owing Steinway $1,082.24. Not surprisingly, Lofing did not find this proposal acceptable.

Lofing stopped making payments on the piano. At this point, the piano was impossible to play and was ruining his technique. To mitigate his damages, Lofing sold the piano in 1988 for $7,000. He purchased a Kawai piano from another dealership for $7,939.48.

MAC filed a complaint for breach of contract, seeking the unpaid balance on the loan and attorney fees pursuant to the sales agreement. Lofing filed a cross-complaint against MAC, Sherman Clay and Steinway, alleging numerous causes of action, including breach of implied and express warranties under the Song-Beverly Consumer Warranty Act (Civ. Code, § 1790 et seq.) and the Magnuson-Moss Warranty—Federal Trade Commission Improvement Act (15 U.S.C. § 2301 et seq.). Lofing further asserted MAC could not recover on the contract if his claims were valid, citing the clause in the sales agreement providing that the holder of the contract was subject "to all claims and defenses which the debtor could assert against the seller of goods . . . ."

At trial, Steinway and Sherman Clay argued they had complied with the warranty requirements by offering to repair or replace the piano.

The jury was instructed: "Plaintiff Music Acceptance Corporation who holds Dan Lofing's consumer credit contract for the purchase of a piano, is subject to the same claims and defenses which cross-complainant Dan Lofing is asserting against cross-defendant Sherman Clay & Company." The jury completed two verdict forms. In verdict form A, relating to MAC's

complaint, the jury found Lofing liable to MAC for breach of contract, and awarded damages of $23,675. In verdict form B, relating to Lofing's cross-complaint, the jury found the piano was a consumer good or product covered by the state and federal consumer protection laws, and found both Steinway and Sherman Clay liable to Lofing for "breach of express or implied warranty."[7] It awarded damages against Steinway in the amount of $8,550, and damages against Sherman Clay of $15,650.

Recognizing the potential confusion caused by these verdicts, the trial court asked the jury whether its intent was to award a net amount of $525 to Lofing. One juror responded: "I think our intent was that, um, we awarded under verdict form A [$23,675]. [¶] And we awarded under verdict form B the total of [$8,550] plus [$15,650]." Another juror added: "And it so happened that there was that five hundred dollars [sic]." The other jurors agreed with this characterization.

Lofing filed motions to vacate the judgment, for judgment notwithstanding the verdict, and for a new trial, arguing the jury's findings on the warranty statutes operated as a defense to MAC's complaint. The parties also argued the question of attorney fees and costs.

The trial court denied Lofing's motions without comment and refused to award fees to any party. The court did, however, award certain costs to MAC, Steinway and Sherman Clay under Code of Civil Procedure section 1141.21.[8] This appeal and cross-appeal followed.

## DISCUSSION

In his appeal, Lofing contends the jury's verdicts on the breach of warranty causes of action compel a verdict in his favor on MAC's complaint by virtue of the clause in the sales contract binding the holder of the contract (MAC) to the same claims as might be asserted against the seller of goods. In a cross-appeal, Steinway asserts it was not liable under either state or federal consumer protection laws, while MAC asserts it was entitled to attorney fees on its complaint. Because all of these issues are rooted in the underlying question of whether Steinway and Sherman Clay violated either the Song-Beverly Consumer Warranty Act or the Magnuson-Moss Warranty—Federal Trade Commission Improvement Act, we turn first to that question.

---

[7]The jury found Steinway's conduct was not willful, thus making civil penalties inappropriate. On a cause of action for breach of warranty under the Commercial Code, the jury found Sherman Clay liable, but exonerated Steinway. The jury rejected Lofing's claims of fraud, negligent misrepresentation and breach of contract.

[8]Code of Civil Procedure section 1141.21 provides a party must pay costs if the judgment upon a trial de novo is less favorable than an arbitration award. An arbitrator had awarded MAC $23,674 against Lofing, and Lofing $35,788.20 against Sherman Clay and Steinway.

## I. *Liability Under the Song-Beverly Consumer Warranty Act*

■ The Song-Beverly Consumer Warranty Act (Civ. Code, § 1790 et seq. [all subsequent statutory references are to the Civil Code unless otherwise indicated]) outlines consumer protection measures for buyers of consumer goods.[9] "[T]he Act is manifestly a remedial measure, intended for the protection of the consumer; it should be given a construction calculated to bring its benefits into action." (*Kwan* v. *Mercedes-Benz of North America, Inc.* (1994) 23 Cal.App.4th 174, 184 [28 Cal.Rptr.2d 371].)

The act applies to both express and implied warranties (§§ 1791.1, 1791.2). Unless specific disclaimer methods are followed, an implied warranty of merchantability accompanies every retail sale of consumer goods in the state.[10] (§ 1792.) This warranty includes a guarantee that the particular item is "fit for the ordinary purposes for which such goods are used." (§ 1791.1, subd. (a)(2).) In contrast, an express warranty is a written statement arising out of a sale in which the "manufacturer, distributor, or retailer undertakes to preserve or maintain the utility or performance of the consumer good or provide compensation if there is a failure in utility or performance[.]" (§ 1791.2, subd. (a)(1).)

Lofing asserted Steinway and Sherman Clay violated both express and implied warranties. He pointed to the warranty he received that specifically guaranteed his piano against defects in materials or workmanship for a five-year period, and also emphasized the promise made by Steinway in its booklet for new owners that care of the piano would not be "particularly time-consuming or expensive." As to the implied warranty of merchantability, Lofing stressed the opinions of the piano technicians that the piano was virtually unplayable and should never have left the factory, i.e., that it was not fit for the ordinary purposes for which pianos are used.

The jury was instructed on both theories, and returned its verdict in favor of Lofing, finding Steinway and Sherman Clay had breached their express or implied warranties.

In contending this finding was erroneous, Steinway relies on section 1793.2, subdivision (d). That statute provides: "[I]f the manufacturer or its representative in this state does not service or repair the goods to conform to

---

[9]"Consumer goods" are defined as "any new product or part thereof that is used, bought, or leased for use primarily for personal, family, or household purposes, except for clothing and consumables." (§ 1791, subd. (a).)

[10]This warranty generally cannot be waived. (§ 1792.3.) A retail seller has a right to indemnification from the manufacturer for any liability found for violation of the implied warranty of merchantability. (§ 1792.)

the applicable express warranties after a reasonable number of attempts, the manufacturer shall either replace the goods or reimburse the buyer in an amount equal to the purchase price paid by the buyer, less that amount directly attributable to use by the buyer prior to the discovery of the nonconformity."

 Steinway contends it complied with this statute when it offered to fly Lofing to New York to select a new piano. Having offered to replace the goods, Steinway argues, it cannot be held liable for a breach of warranty. Lofing counters that in order to give effect to consumer protection legislation, the choice of refund or replacement must be left to the consumer, not the manufacturer. If Steinway refuses to honor Lofing's choice, he argues, the company has breached its warranty.

Lofing also contends Steinway's election of replacement was "too little, too late." He points not only to the delays in resolving his complaints, and the difficulties he experienced with Sherman Clay and its technician (difficulties he assumes will continue if he is obligated to take another Steinway piano), but also argues that because each piano is unique in touch and tone, he should not be forced to accept another piano that may not meet his standards. He further suggests that requiring him to select another piano after becoming aware of possible defects in the bushings of pianos of this model is to force him to accept a piano that may have many of the same flaws.

While the parties present intriguing arguments on the issue of whether it is the buyer or manufacturer who is empowered to elect between reimbursement and replacement, we need not resolve that question. The question of reimbursement or replacement is relevant only under section 1793.2, since it is subdivision (d) of that statute that outlines the steps required of a manufacturer. However, this section applies only when goods cannot be made to conform to the "applicable *express* warranties." (Italics added.) It has no relevance to the implied warranty of merchantability, one of the alternative theories argued to the jury.

The remedies for a breach of this implied warranty are clear: "Any buyer of consumer goods injured by a breach of the implied warranty of merchantability . . . has the remedies provided in Chapter 6 (commencing with 2601) and Chapter 7 (commencing with Section 2701) of Division 2 of the Commercial Code, and, in any action brought under such provisions, Section 1794 of this chapter shall apply." (§ 1791.1, subd. (d).)

Section 1794, subdivision (a), provides: "Any buyer of consumer goods who is damaged by a failure to comply with any obligation under this

chapter or under an implied or express warranty or service contract may bring an action for the recovery of damages and other legal and equitable relief." Subdivision (b)(1) of the same statute continues: "Where the buyer has rightfully rejected or justifiably revoked acceptance of the goods or has exercised any right to cancel the sale, Sections 2711, 2712, and 2713 of the Commercial Code shall apply."

California Uniform Commercial Code section 2711 provides that when a buyer rightfully rejects or justifiably revokes acceptance of goods, the buyer may cancel and recover specified damages *in addition to recovering so much of the price as has been paid*[.]" (Italics added.) Thus, in the event of a breach of the implied warranty of merchantability, the buyer is entitled to cancel the contract and recover any amounts paid toward the purchase of the goods. (§§ 1791.1, subd. (d), 1794, subds. (a), (b)(1); Cal. U. Com. Code, § 2711.)

The jury found Steinway and Sherman Clay breached their "express *or implied*" warranties. Given the alternative grounds on which liability may be predicated, Steinway's challenge is unavailing. Abundant evidence supports a finding that the companies breached the implied warranty of merchantability. Numerous technicians outlined the gross defects with Lofing's piano. Neither Steinway nor Sherman Clay seriously challenged these diagnoses; rather their defense centered on their offer to replace the piano. Under the California Uniform Commercial Code, however, the buyer has a right to cancel the contract and seek reimbursement. Lofing pursued such a remedy, and the jury found in his favor. We will not disturb that determination.[11]

## II. *Lofing's Liability to MAC*

In his appeal, Lofing contends that once the jury determined that Sherman Clay breached its express or implied warranties, the jury was compelled to render a verdict in favor of Lofing on MAC's complaint to recover the unpaid balance on the piano. He offers three alternative but intertwined arguments in support of his claim, relying on the contract language and the related instruction, the provisions of the Unruh Act (§ 1801

---

[11]Having found Steinway liable for breach of the implied warranty of merchantability under the Song-Beverly Consumer Warranty Act, we have no occasion to address its challenge based on the federal Magnuson-Moss Warranty—Federal Trade Commission Improvement Act. (15 U.S.C. § 2301 et seq.) We note, however, that even Steinway recognizes that under this federal legislation, a warrantor must "as a minimum remedy such consumer product within a reasonable time and without charge, in the case of a defect, malfunction, or failure to conform with [a] written warranty[.]" (15 U.S.C. § 2304(a)(1). However, "if the product. . . contains a defect . . . after a reasonable number of attempts by the warrantor to remedy defects . . . in such product, such warrantor *must permit the consumer to elect* either a refund for, or replacement without charge of, such product. . . ." (Id., § 2304(a)(4), italics added.)

et seq.) and a Federal Trade Commission regulation, the latter two sources having been cited below as authority for the given jury instruction. Lofing's claim has merit.

We turn first to the language of the contract itself and the related instruction given to the jury. The sales contract contained a clause providing that "[a]ny holder of this consumer credit contract is subject to all claims and defenses which the debtor could assert against the seller of goods or services obtained pursuant hereto, or with the proceeds hereof." The jury was instructed accordingly: "Plaintiff Music Acceptance Corporation who [sic] holds Dan Lofing's consumer credit contract for the purchase of a piano, is subject to the same claims and defenses which cross-complainant Dan Lofing is asserting against cross-defendant Sherman Clay & Company." Lofing asserts this instruction compelled the jury to enter a verdict in favor of Lofing on MAC's complaint once it found that Lofing had valid claims against Sherman Clay. We agree.

As noted earlier, the remedy for breach of an implied warranty is clear: a buyer may cancel the contract and recover specified damages in addition to recovering any amounts paid toward the purchase price. (§§ 1791.1, subd. (d), 1794, subd. (b); Cal. U. Com. Code, § 2711.) Thus, if Lofing had financed his piano purchase with Sherman Clay, he could have canceled his contract and not been obligated to make any further payments under the canceled agreement. The import of the cited contract clause and jury instruction is equally clear: MAC stands in the shoes of Sherman Clay and is subject to the same claims and defenses. If Lofing would not have been required to make further payments to Sherman Clay, he also would not have to make further payments to MAC. He was entitled to cancel the contract, receive his money back and be relieved of any further obligations under the agreement.

We note that much of the confusion engendered below could have been avoided had an additional jury instruction been given.[12] The jury was informed only that "Plaintiff Music Acceptance Corporation who [sic] holds Dan Lofing's consumer credit contract for the purchase of a piano, is subject to the same claims and defenses which cross-complainant Dan Lofing is asserting against cross-defendant Sherman Clay & Company." They were not told of the instruction's specific ramifications, namely that if the jury found that Sherman Clay had breached its implied or express warranties, MAC could not recover the unpaid balance on the loan because it stood in the same position as Sherman Clay.

[12]Part of this confusion may have stemmed from the fact that it appears the jury first considered MAC's complaint and only after reaching a verdict in that claim did they turn to Lofing's cross-complaint.

This consequence was, however, clearly explained to the jury throughout trial. In his opening argument, Lofing's attorney stated that MAC stood "in the same shoes as Sherman Clay,"[13] and urged the jury to deny MAC's claim for additional money "for a piano that was never right." Lofing's former attorney testified that when he wrote MAC that Lofing would not be making further payments on his loan, he explained that Lofing's claim against Sherman Clay exceeded the balance due on the loan, and that MAC should look to Sherman Clay for payment. The attorney testified he wrote this letter because Lofing was entitled to assert any defenses against MAC that he had against Sherman Clay.

In closing argument, Lofing's attorney explicitly discussed the ramifications of the relied-upon contract clause. He told the jury: "Now, there has also been in this case a claim made by Music Acceptance, as you know, against Mr. Lofing. For money that he declined to pay, for the piano. That claim is negated if you find that any of the theories upon which Mr. Lofing asks you to allow him to prevail is one that you find. [¶] In other words, if you find for Mr. Lofing on any of the theories that he presents to you, then the claim of Music Acceptance cannot prevail." He continued: "[W]hen that piano didn't perform, when Mr. Lofing wasn't given the relief to which he was entitled under the law, the people who wrote this contract, Sherman Clay, and the people who want to benefit by it, Music Acceptance, one [and] the same, lost their right, they lost their right to enforce that clause." After reading the jury the contract language, the attorney argued: "Right there [in] their own contract it gives him the right to be excused from paying for that piano if that piano doesn't work."

MAC itself recognizes that a buyer may be excused from making further payments on a contract under the proper circumstances. While MAC claims "[i]t would be manifestly unfair to excuse the purchaser of a consumer good from payment simply because some breach of warranty was found," it acknowledges: "It is certainly possible that under some facts a breach of warranty is so great that it excuses the buyer from performance. However,

---

[13]Counsel stated: "[T]he testimony will show that the financing for this purchase was arranged through this organization or entity called Music Acceptance [C]orporation. But the evidence will also show you—and I believe what you heard from [MAC's] counsel is that there is no difference between Sherman Clay and Music Acceptance [C]orporation. [¶] You will hear that they located, their offices are located at the same address, in San Bruno. You will hear that, and have heard the representation that Music Acceptance is a corporation which dissolved, and now just does business, or, Sherman Clay does business as Music Acceptance. [¶] And you will hear something else: You will hear and see the language on the contract that gives Mr. Lofing the right to make any claim or to take any defense he has against Sherman Clay, and make that same claim or assert that same defense against Music Acceptance. [¶] In other words, this language that you will be able to read on a contract itself puts Music Acceptance in the same shoes as Sherman Clay. The seller of the piano."

that is not the evidence in this case." MAC's claims are belied by the record. The jury was instructed that any nonconformity must "substantially impair[] the use or value of the piano to the buyer." Piano technicians described the numerous serious defects in Lofing's piano and deemed it "unplayable." Lofing chose not to play the instrument at all, rather than risk ruining his technique. Even the technicians from Steinway and Sherman Clay recognized the piano's problems were serious, as evidenced by Steinway's offer to replace the instrument. The breach of the implied warranty of merchantability is abundantly clear, and justifies relieving plaintiff from his financial obligation. Any claim to the contrary simply is not credible.

Equally unavailing is MAC's claim that to excuse Lofing from any further payments on his loan would be to award him a double recovery. We disagree. Lofing asked the jury for a total of $25,860 in damages as follows:

| | | |
|---|---|---|
| 1. | $ 6,000 | trade-in value of his old piano |
| 2. | $ 8,793 | payments made on the contract |
| 3. | $ 1,272 | loss of use of piano |
| 4. | $ 1,060 | rental of another piano |
| 5. | $ 345 | cost of repairs |
| 6. | $10,000 | emotional distress |
| 7. | $ 5,390 | medical treatment |
| 8. | ($ 7,000) | deduction for sale proceeds[14] |

The jury awarded Lofing a total of $24,200. MAC's claim that this amount necessarily includes the $24,000 owed on the balance of the contract is

[14]The jury was instructed that the loan balance of approximately $24,000 could also be included as an item of damages, but in his closing argument, Lofing's attorney made it clear that this amount should be awarded *only* if the jury believed fault lay primarily with Steinway, in which case the jury could award MAC the balance of the contract and assess the amount against Steinway.

On another front, and as noted earlier, the jury also found Sherman Clay liable for breach of warranty under the Commercial Code. The jury was instructed that the measure for damages for such a breach included "the difference between the value of the piano at the time it was received and the value it would have had as warranted." The jury's verdict does not specify the theory relied upon in assessing damages.

unsupported by the record. Many of the amounts claimed in damages (such as the down payment, payments made, and repair/inspection charges) were unchallenged. Thus, while Steinway and Sherman Clay vociferously asserted they had not breached any warranties, they did not question that these claimed items of damage were compensable in the claimed amount if liability was in fact established. If these unchallenged amounts are deducted from the jury's verdict, it is clear the balance does not offset the $23,675 awarded to MAC for the loan amount. It is far more likely that this balance represented other claimed items of damages.[15]

In sum, the language of the contract and the related jury instruction compelled a verdict in favor of Lofing on MAC's complaint once the jury found Sherman Clay had breached its warranties. While this conclusion resolves the matter presented on appeal, the parties have also analyzed the situation under two alternative theories, the state's Unruh Act (§ 1801 et seq.) and a Federal Trade Commission (FTC) regulation (16 C.F.R. § 433.2 (1975)). Both of these sources were cited as authority for instructing the jury that MAC stood in the shoes of Sherman Clay and was subject to the same claims and defenses. ■ Lofing contends the Unruh Act and the FTC

---

[15]We digress briefly to discuss one aspect of the claimed damages. The jury was instructed that consequential damages for breach of the consumer warranty laws include emotional distress damages and amounts expended for medical services. However, in the usual situation, emotional distress damages are *not* recoverable under the Song-Beverly Consumer Warranty Act. (*Kwan* v. *Mercedes-Benz of North America, Inc., supra*, 23 Cal.App.4th at pp. 187-192.) "The clear mandate of section 1794 . . . is that the compensatory damages recoverable for breach of the Act are those available to a buyer for a seller's breach of a sales contract. . . . [S]uch damages do not in most cases include recompense for mental suffering independent of physical injury." (*Id.* at p. 188.) The court explained: "The general rule in California is that damages for mental suffering may not be recovered in an action for breach of an ordinary commercial contract. [Citations.] [¶] California courts have recognized, on the other hand, the existence of extraordinary contracts, ones 'which so affect the vital concerns of the individual that severe mental distress is a foreseeable result of breach. For many years, our courts have recognized that damages for mental distress may be recovered for breach of a contract of this nature. . . .' [Citation.] Stated another way, the exceptional contracts are those whose terms ' "relate to matters which concern directly the comfort, happiness, or personal welfare of one of the parties, or the subject matter of which is such as directly to affect or move the affection, self-esteem, or tender feelings of that party. . . ." ' " (*Ibid.*) The *Kwan* court further noted "California law appears substantially in accord with the Restatement, which provides: 'Recovery for emotional disturbance will be excluded unless the breach also caused bodily harm or the contract or the breach is of such a kind that serious emotional disturbance was a particularly likely result.' " (*Id.* at p. 189.)

Here, the parties apparently assumed there was sufficient physical injury to warrant emotional distress damages, or that this was the type of extraordinary case that can qualify for such damages. Neither Steinway nor Sherman Clay ever suggested that these damages might be inappropriate. Since no objection was raised below to this claim for damages, and the matter is not raised on appeal by any party, we shall assume that emotional distress damages are a proper component of damages in this case.

regulation also compel the conclusion that the judgment against Lofing must be reversed. We turn to these arguments now.

The Unruh Act governs retail installment sales. Section 1804.2 provides: "(a) An assignee of the seller's rights is subject to all equities and defenses of the buyer against the seller arising out of the sale, notwithstanding an agreement to the contrary, but the assignee's liability may not exceed the amount of the debt owing to the assignee at the time of the assignment. [¶] (b) The assignee shall have recourse against the seller to the extent of any liability incurred by the assignee pursuant to this section regardless of whether the assignment was with or without recourse."

Thus, under California law, any defenses or claims a buyer might assert against a seller may also be asserted by a buyer against an assignee of the seller, such as a finance company. ■ As our Supreme Court noted, "The purpose of the Unruh Act is to protect consumers, and it should be liberally construed to that end." (*Vasquez* v. *Superior Court* (1971) 4 Cal.3d 800, 823 [94 Cal.Rptr. 796, 484 P.2d 964].) The court explained that in many circumstances, "a judgment against the seller alone would represent a Pyrrhic victory because the . . . victorious consumers remain liable to the finance companies, which as the assignees of the installment contracts claim that they are entitled to payment even if the seller acted fraudulently. . . . Obviously, if [the consumers] are to be made whole for the wrongs allegedly done to them, the finance company . . . must be held liable as assignees if [the seller] is culpable." (*Id.* at pp. 821-822.)

■ Under section 1804.2, Lofing was entitled to assert breach of warranty as a defense to his nonpayment on the installment contract.

While MAC apparently agrees with this conclusion in principle, it seeks to distinguish *Vasquez*, noting that in that case "[t]he court held that the plaintiffs could maintain a rescission action against finance companies on the basis of fraud. The case does not discuss breach of warranty and does not stand for the proposition that a breach of warranty excuses performance by the buyer." This claim ignores the clear language of section 1804.2, subdivision (a), which provides that an assignee is "subject to *all* equities and defenses of the buyer against the seller . . . ." (Italics added.) The statute does not in any way limit the types of defenses or claims that may be asserted.

■ The same result obtains under federal law. The FTC adopted a rule (16 C.F.R. § 433.2 (1975)) which makes it an unfair or deceptive act or

practice for a seller to take or receive a consumer credit application which does not contain the following provision in large, bold-face type:

"NOTICE

ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUB-JECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER." This notice is identical to that included in Lofing's sales contract.

The FTC enacted this rule because it believed it was "an unfair practice for a seller to employ procedures in the course of arranging the financing of a consumer sale which separate[d] the buyer's duty to pay for goods or services from the seller's reciprocal duty to perform as promised." (Statement of Basis and Purpose, 40 Fed.Reg. 53522 (Nov. 18, 1975).) The FTC explained: "Our primary concern . . . has been the distribution or allocation of costs occasioned by seller misconduct in credit sale transactions. These costs arise from breaches of contract, breaches of warranty, misrepresentation, and even fraud. The current commercial system which enables sellers and creditors to divorce a consumer's obligation to pay for goods and services from the seller's obligation to perform as promised, allocates all of these costs to the consumer/buyer." (*Ibid.*)

In its "Guidelines on Trade Regulation Rule Concerning Preservation of Consumers' Claims and Defenses," the FTC explained further: "[The] dramatic increase in consumer credit over the past thirty years has caused certain problems. Evolving doctrines and principles of contract law have not kept pace with changing social needs. One such legal doctrine which has worked to deprive consumers of the protection needed in credit sales is the so-called 'holder in due course doctrine.' Under this doctrine, the obligation to pay for goods or services is not conditioned upon the seller's corresponding duty to keep his promises.

"Typically, the circumstances are as follows: A consumer relying in good faith on what the seller has represented to be a product's characteristics, service warranty, etc., makes a purchase on credit terms. The consumer then finds the product unsatisfactory; it fails to measure up to the claims made on its behalf by the seller, or the seller refuses to provide promised maintenance. The consumer, therefore, seeks relief from his debt obligations only to find that no relief is possible. His debt obligation, he is told, is not to the

seller but to a third party whose claim to payment is legally unrelated to any promises made about the product.

"The seller may, prior to the sale, have arranged to have the debt instrument held by someone other than himself; he may have sold the debt instrument at a discount after the purchase.

"From the consumer's point of view, the timing and means by which the transfer was effected are irrelevant. He has been left without ready recourse. He must pay the full amount of his obligation. He has a product that yields less than its promised value. And he has been robbed of the only realistic leverage he possessed that might have forced the seller to provide satisfaction—his power to withhold payment." (41 Fed.Reg. 20022 (1976).)

As one court noted, before this rule was adopted "[t]he reciprocal duties of the buyer and seller which were mutually dependent under ordinary contract law became independent of one another. Thus, the buyer's duty to pay the creditor was not excused upon the seller's failure to perform. In abrogating the holder in due course rule in consumer credit transactions, the FTC preserved the consumer's claims and defenses against the creditor-assignee. The FTC rule was therefore designed to reallocate the cost of seller misconduct to the creditor. The commission felt the creditor was in a better position to absorb the loss or recover the cost from the guilty party—the seller." (*Home Sav. Ass'n* v. *Guerra* (Tex. 1987) 733 S.W.2d 134, 135.)

Lofing cites numerous cases involving the application of the FTC rule. We briefly discuss two of them. In *Tinker* v. *De Maria Porsche Audi, Inc.* (Fla.Dist.Ct.App. 1984) 459 So.2d 487, plaintiff bought a used car and financed the purchase through the automobile dealer, who subsequently assigned the contract to a bank. The contract included the clause required by the FTC rule. Plaintiff had numerous difficulties with the car. When the dealer failed to replace or repair the car, leaving the car inoperable, plaintiff stopped making his loan payments. He brought an action against the dealer and bank for fraud and misrepresentation. The bank counterclaimed for the unpaid balance due on the auto loan. The jury returned a verdict in favor of plaintiff and against the dealer for $8,250, but awarded the bank $4,500 representing the balance owed on the installment contract. (*Id.* at pp. 489-490.)

Plaintiff asserted these verdicts were inconsistent, and the appellate court agreed. After reviewing the rationale behind the FTC rule, the court concluded: "[I]t is clear that not only does the Notice clause entitle the buyer to withhold the balance of the purchase price owed to the creditor when the

seller's contractual duties are not fulfilled, but it gives the buyer a complete defense should the creditor sue for payment." (459 So.2d at p. 492.) The court noted the trial court had so instructed the jury, but "its failure to follow that instruction constituted error which should have been corrected by the trial court on [plaintiff's] timely motion alleging inconsistency of the verdicts. The error is correctable by this court without a remand. We hold that the fraud found to have been perpetrated by [the seller] constituted a complete defense to the Bank's counterclaim for the balance owed on the installment sales contract, . . ." (*Id.* at pp. 492-493.)

A similar result was reached in *General Motors Acceptance Corp.* v. *Grady* (1985) 27 Ohio App.3d 321 [501 N.E.2d 68], a case strikingly similar to the one before us. Grady purchased a car from a dealership and financed the transaction. The car proved to be less than reliable, requiring numerous repairs over a brief period of time. (*Id.* at pp. 69-70.) Frustrated by the dealer's inability to remedy the situation, Grady wrote the dealer that she was revoking the sale, and she stopped making payments on her automobile loan. The finance company, General Motors Acceptance Corporation (GMAC), recovered the car, sold it, and then sued Grady for the deficiency owing. Grady filed suit against the dealer and GMAC, asserting breach of the implied warranty of merchantability. After a court trial, judgment was entered in favor of GMAC and against Grady, but in favor of Grady and against the car dealer. (*Id.* at p. 70.)

On appeal, Grady asserted the judgment entered in favor of GMAC must be reversed. (*General Motors Acceptance Corp.* v. *Grady, supra,* 501 N.E.2d at p. 72.) The court agreed, noting the contract included the FTC rule notice. "[B]y both contract and statute, any claims or defenses which the debtor could assert against the seller are also valid defenses against the holder of the installment agreement. Any loss resulting to GMAC as a result of a successful claim or defense asserted by Grady may be recovered by GMAC from [the dealer] in the appropriate action." (*Ibid.*) The court concluded: "The trial court . . . found for Grady on the issue of breach of implied warranty of merchantability. This being a valid defense of the buyer against the seller, the same is also a valid defense against the holder of the note, GMAC." (*Ibid.*) The court modified the judgment to reflect judgment in favor of Grady and against GMAC. (*Ibid.*)

Attacking defendant's claims on another front, MAC contends the FTC rule is inapplicable here. MAC cites comments in the FTC guidelines discussing possible limitations on the rule. Specifically, the FTC points out that because the regulation's definition of "Financing a Sale" expressly refers to the Truth in Lending Act (15 U.S.C. § 1601 et seq.), it "thus

incorporate[s] the limitations contained in these laws. As a result, even with respect to transactions involving a sale of consumer goods or services, a purchase involving an expenditure of more than $25,000 is not affected by the Rule." (41 Fed.Reg. 20024 (May 14, 1976).) MAC argues that since the cash price of the piano, including sales tax, was $25,650.94, the transaction is exempt from these requirements.

MAC's argument is unavailing as it is based on the guideline's unfortunate use of the phrase "expenditure of more than $25,000." As Lofing points out, the exemption referred to in the Truth-in-Lending Act does not speak of *expenditures* of more than $25,000, but of transactions in which the "*total amount financed* exceeds $25,000." (15 U.S.C. § 1603(3), italics added.) Here, because Lofing traded in his piano, the total amount financed was $19,650.94, well below the exemption level.

More importantly, it is irrelevant whether the FTC rule applies. Even if such a notice was not required to be given, the fact remains that it was: Lofing's contract included the precise language mandated by the FTC rule. Put simply, Lofing is in the same position whether we apply the FTC rule, the Unruh Act, or the language of his particular contract. The jury's finding that Sherman Clay breached its warranties mandates that the judgment in favor of MAC and against Lofing be reversed.[16]

### III. *Attorney Fees and Costs*

Lofing raises two claims regarding attorney fees and costs. First, he contends he was the prevailing party on appeal as evidenced by his $525 net recovery, and is thus entitled to attorney fees under section 1794, subdivision (d).[17] He further asserts the court erred in denying his motion to tax costs. In its cross-appeal, MAC contends it is entitled to attorney fees. Our disposition of this case renders these claims moot. As the judgment in favor of MAC must be reversed, Lofing is clearly the prevailing party and is entitled to attorney fees.

### DISPOSITION

The judgment on the cross-complaint is affirmed. The judgment on the complaint is reversed and the trial court is directed to enter judgment in

---

[16]Given this conclusion, we do not address Lofing's claims that the court erred in denying his posttrial motions attacking the verdict in favor of MAC.

[17]Section 1794, subdivision (d), provides: "If the buyer prevails in an action under this section, the buyer shall be allowed by the court to recover as part of the judgment a sum equal to the aggregate amount of costs and expenses, including attorney's fees based on actual time expended, determined by the court to have been reasonably incurred by the buyer in connection with the commencement and prosecution of such action."

favor of Lofing on the complaint. The matter is remanded to the trial court for further consideration of attorney fees and costs. Lofing is awarded costs on appeal.

Puglia, P. J., and Nicholson, J., concurred.

A petition for a rehearing was denied February 17, 1995, and the petition of plaintiffs, cross-defendants and appellants for review by the Supreme Court was denied April 12, 1995.