Filed 7/16/14 Unmodified opinion attached

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ILAN BRAND,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>HYUNDAI MOTOR AMERICA et al.,<br><br>    Defendants and Respondents. | G048880<br><br>(Super. Ct. No. 30-2012-00541006)<br><br>ORDER DENYING REHEARING AND MODIFYING OPINION; NO CHANGE IN JUDGMENT |

Respondent's rehearing petition is DENIED.  The opinion filed June 17, 2014 is MODIFIED as follows:

On page 6, in the first new paragraph, in that paragraph's last sentence ending ". . . whether there were other similar flaws in the sunroof wiring, or whether the problem might reoccur," add a new footnote at the end of the sentence as follows:

> [1]    Brand acknowledged in his testimony that a service technician told him "probably" on the day he attempted to rescind his purchase that the sunroof problem had been fixed.  But of course that did not establish the problem had been fixed, nor that it was "easily fixable" as Hyundai now claims.  Hyundai previously had told Brand several times the problem had been fixed.

Renumber the ensuing footnote on page 12 as footnote number 2.


The modification effects no change in the judgment.


                                        ARONSON, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


IKOLA, J.

Filed 6/17/14 Unmodified opinion

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ILAN BRAND,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>HYUNDAI MOTOR AMERICA et al.,<br><br>    Defendants and Respondents. | G048880<br><br>(Super. Ct. No. 30-2012-00541006)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Robert J. Moss, Judge.  Reversed and remanded.

Hutchens & Hutchens, Lawrence J. Hutchens and Kalman A. Hutchens for Plaintiff and Appellant.

Horvitz & Levy, Peder K. Batalden and John A. Taylor; Beatty & Myers, Sean D. Beatty, John W. Myers and Soheyl Tahsildoost for Defendants and Respondents.

\*            \*            \*

Ilan Brand appeals from the trial court's entry of judgment in favor of defendants Hyundai Motor America and Allen Used Cars, LLC (dba Allen Hyundai; collectively hereafter Hyundai) after granting Hyundai's nonsuit motion on Brand's breach of implied warranty of merchantability lawsuit. (Civ. Code, § 1792; all subsequent statutory references are to this code unless noted.) Brand argues the trial court erred in granting the motion on grounds that no reasonable jury could conclude a new vehicle sunroof that spontaneously opens and closes while driving constitutes a safety hazard in violation of the implied warranty. As we explain, Brand is correct and we therefore reverse the judgment and remand the matter for further proceedings consistent with this opinion.

I

FACTUAL AND PROCEDURAL BACKGROUND

Brand leased a new Hyundai Genesis sedan from Allen Hyundai on January 2, 2012. Brand, a tax accountant, returned home in his old vehicle that day because he planned to sell it in Las Vegas, where he commuted regularly to the other office in his practice, especially during tax season between January and April. A dealer salesman drove the new Hyundai about 20 miles to Brand's home in Irvine the next day, Brand drove the salesman back to the dealership, and then continued without incident another 10 miles to his office, where he parked for the remainder of the day.

On his drive home on the 5 freeway, however, the Hyundai sunroof spontaneously and repeatedly began opening and closing. It moved "back and forth" without Brand pushing any buttons, and he was powerless to stop it. The odd, uncontrollable movement of the sunroof was itself distracting, but the inrush of wind also caused tax returns and other documents to suddenly swirl about the cabin. Brand tried to

2

close the sunroof to no avail and while trying to catch and tamp down the various documents, he exited the freeway. He immediately returned the vehicle to the Hyundai dealership.

The next day the Hyundai dealership informed Brand it had diagnosed the problem as a defective sunroof switch assembly.

The following day the dealership informed Brand the switch assembly it had in stock was not suitable to make the repair, but it would order a new one, and his vehicle would be ready in 24 hours.

The next day, a Friday, the vehicle was not ready and Brand was referred to the dealership's general manager when he expressed frustration at Hyundai's inability to resolve the problem. The general manager assured him the vehicle would be ready on Monday.

Brand drove his old vehicle to his office in Las Vegas the next day, and arranged to have the car sold there.

On Monday, January 9, a week after he leased the new Hyundai, he received a call from the dealership informing him his vehicle was "ready to be picked up." Later that day, however, the dealership called to inform him the car was not ready. The dealership's attempt to repair the sunroof with a different switch assembly had failed. The dealership informed him it would attempt the repair with a new sunroof motor assembly. Brand was still in Las Vegas, with plans to return on a flight the next day and pick up his car.

The next day he received a call in the morning from the dealership informing him the new Hyundai was not ready. The dealership assured him a Hyundai factory technician specializing in sunroofs would be at the dealership that day to fix his

vehicle.  Brand flew back from Las Vegas and his wife drove him directly to the dealership in the evening.  His car was not ready because the Hyundai technician had not shown up.  The dealership assured him the technician would be there the next morning.  The general manager promised to call him by 10:00 a.m.

The next day, Wednesday, January 11th, the dealership did not call by 10:00 a.m.  Brand waited an hour.  The dealership did not call by 11:00 a.m., and when Brand had not received a call by noon, he decided he wanted to return the defective Hyundai.  He wrote the general manager the following e-mail, in pertinent part:  "As you know, I delivered the car back to you on Tuesday January 3, after I had it for only a couple of hours since finalizing the transaction the prior day.  The moonroof kept opening and closing on its own.  [¶]  Since then I have been informed by Steve Vargas, your service manager, that the problem was in the defective switch assembly.  The part was ordered and installed but that did not solve the problem so a new motor assembly was ordered and installed.  On Monday Jan[uary] 9[,] Mr. Vargas called to say the car was ready to be picked [up] only to call back the following morning to inform [me] that the moonroof was acting up again and that his technician was trying to resolve the problem, to no avail as of today.  [¶]  At this point I would like to rescind the contract and demand that you refund my $6000 deposit."  Brand noted in another e-mail later that day to the general manager:  "I must tell[] you that I have lost my faith in the Hyundai brand after this bad experience."

Brand also called Hyundai's corporate toll-free customer service number to report his dissatisfaction and demand rescission.  In an e-mail to the dealership's general manager the next day, January 12th, Brand noted that the service department "left a voice mail at 7:37 am saying that corporate is willing to pay my first lease payment due

4

February 1. He also said that he would check with his manager to find out the status of the car. In other words, the problem has not been solved yet after 9 days! [¶] You called me at 10:14 am saying that the matter is now up to corporate . . . ." Two weeks later, on January 25, Brand received a letter from Hyundai's corporate office offering to waive his first two lease payments of approximately $450 each, but rejecting his rescission request.

Brand then filed this action, alleging the defective sunroof constituted a breach of the manufacturer's and retailer's implied warranty of merchantability. After discovery that included two inspections of the vehicle and numerous depositions, Hyundai moved for summary judgment, which the trial court denied. The trial court explained that "there is evidence that . . . the Genesis purchased was not of the same quality as those generally accepted in the trade as testified to by Mr. Brewster [*sic*; according to Brand, the witness was an Allen Hyundai service manager, Stephen Blacker]." The trial court concluded: "[T]he defective sunroof is sufficient to establish triable issues as to the breach of the implied warranty of merchantability."

At trial in May 2013, Brand testified to the events and chronology recounted above. He also noted that while he never picked up the defective Hyundai and instead continued to drive his old vehicle, he faithfully made the Hyundai lease payments and maintained insurance on the vehicle because he did not want his credit to be adversely affected.

Brand also called Blacker, Allen Hyundai's service manager, as a witness under Evidence Code section 776 during his case-in-chief. (See *Miller v. Dussault* (1972) 26 Cal.App.3d 311, 318 ["Although received during plaintiff's case, evidence elicited from an adverse party under section 776 is not treated as the plaintiff's evidence"]; see also *Ashcraft v. King* (1991) 228 Cal.App.3d 604, 611 [in determining

5

motion for nonsuit, testimony favorable to plaintiff adduced from an adverse witness under Evidence Code, § 776 must be taken as true and unfavorable portions disregarded].) Blacker testified the dealership never duplicated Brand's claim in his testimony that the sunroof closed by itself. He also testified that none of the dealership's service records reflected a problem in which the sunroof closed by itself.

Blacker acknowledged, however, that a vehicle should not "be sold with a short in [the] wiring of the sunroof." He and his service department personnel had examined more than 50 new 2012 Hyundai Genesis sedans and none of them had an electrical short in the sunroof or other sunroof malfunction. According to Blacker, the dealership determined the problem in Brand's sunroof was caused by an electrical short, repaired the problem, and notified Brand of the repair on January 11th, the day he notified Hyundai of his intent to rescind. Blacker explained, "There[] was a very small break in [the] insulation of a wire about the size of a head of a ballpoint pen, as it ran from the sunroof down through the body, and it would intermittently touch causing the sunroof to open." Blacker did not identify what caused the "nick" in the electrical wiring that caused the short, or whether there were other similar flaws in the sunroof wiring, or whether the problem might reoccur.

When Brand's counsel asked Blacker whether "a 2012 Hyundai Genesis [should] have a problem at delivery with a sunroof where it randomly opens and closes," Hyundai's attorney objected that the question was argumentative. The trial court noted, "I think it is argumentative," but continued: "Of course not. It's a defect in the vehicle. It shouldn't have happened."

When Brand rested his case-in-chief after he and Blacker testified, Hyundai moved for a nonsuit, which the trial court granted. The court reasoned: "Well, I don't

6

agree with the defense argument that the minimum standard is just getting from point 'A' to point 'B'. [¶] There has to be — the standard is higher than that. . . . [¶] However, the law of implied warranty does not require that a vehicle be defect free when it's delivered to a customer. [¶] There can be problems. There are often problems, and in my assessment this is a case where there really is no factual dispute. [¶] We all know what happened, what repair attempts were made, and in my assessment the malfunctioning of the sunroof does not rise to the level of a breach of the implied warranty of merchantability. [¶] So for that reason, I am going to grant the motion for non-suit. That's my ruling."

## II

## DISCUSSION

We review a grant of nonsuit de novo, applying the same standard governing the trial court. (*Saunders v. Taylor* (1996) 42 Cal.App.4th 1538, 1541-1542.) As the Supreme Court has explained, "A defendant is entitled to a nonsuit if the trial court determines that, as a matter of law, the evidence presented by plaintiff is insufficient to permit a jury to find in his favor. [Citation.] 'In determining whether plaintiff's evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses. Instead, the evidence most favorable to plaintiff must be accepted as true and conflicting evidence must be disregarded.'" (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291 (*Nally*).) Consequently, the reviewing court "will not sustain the judgment '"unless interpreting the evidence most favorably to plaintiff's case and most strongly against the defendant and resolving all presumptions, inferences and doubts in favor of the plaintiff, a judgment for the defendant is required as a matter of law."' [Citation.]" (*Ibid.*)

7

The trial court concluded in granting the nonsuit that no reasonable jury could determine Hyundai breached the implied warranty of merchantability under the Song-Beverly Consumer Warranty Act (§ 1790 et seq.). The act "is a remedial measure intended for the protection of consumers and should be given a construction consistent with that purpose." (*Oregel v. American Isuzu Motors, Inc*. (2001) 90 Cal.App.4th 1094, 1103; *Murillo v. Fleetwood Enterprises, Inc*. (1998) 17 Cal.4th 985, 990 ["the Song-Beverly Act is strongly pro-consumer"].) The act provides for both express and implied warranties, and while under a manufacturer's express warranty the buyer must allow for a reasonable number of repair attempts within 30 days before seeking rescission (§ 1793.2, subds. (b),(d)), that is not the case for the implied warranty of merchantability's bulwark against fundamental defects. (*Mocek v. Alfa Leisure, Inc.* (2003) 114 Cal.App.4th 402, 406-408 (*Mocek*).)

Under the implied merchantability warranty, "every sale of consumer goods that are sold at retail in this state shall be accompanied by the manufacturer's and the retail seller's implied warranty that the goods are merchantable." (§ 1792.) The warranty "'arises by operation of law'" and therefore applies despite its omission from a purchase contract. (*Mega RV Corp. v. HWH Corp.* (2014) 225 Cal.App.4th 1318, 1330; *American Suzuki Motor Corp. v. Superior Court* (1995) 37 Cal.App.4th 1291, 1295 (*American Suzuki*).) Merchantability, as pertinent here, means that the goods "[p]ass without objection in the trade under the contract description," and are "fit for the ordinary purposes for which such goods are used." (§ 1791.1, subd. (a).) "When there has been a breach of the implied warranty of merchantability, a buyer 'may bring an action for the recovery of damages and other legal and equitable relief.' (§ 1794, subd. (a).)" (*Mocek*, *supra*, 114 Cal.App.4th at p. 406 [buyer's options include rescission].)

8

Although uncommon in everyday use, the phrase "pass without objection in the trade under the contract description" is also used in section 2-314 of the Uniform Commercial Code (UCC) concerning merchantability. (See, e.g., Cal. U. Com. Code, § 2314, subd. (2)(a).) A leading commentary on the UCC notes that the requirement that the goods "pass without objection in the trade under the contract description" is "more or less a synonym of 'fit for ordinary purposes,'" but focuses more precisely on trade usage, similar goods, and the seller's conduct. (1 White & Summers, Uniform Commercial Code (4th ed.1995) § 9-8, p. 523.) The dual statutory requirements in section 1791 of passing without objection in the trade and ordinary fitness therefore overlap to some degree.

Accordingly, a ""'"core test of merchantability is fitness for the ordinary purpose for which such goods are used."'"" (*Mexia v. Rinker Boat Co., Inc.* (2009) 174 Cal.App.4th 1297, 1303 (*Mexia*).) "Such fitness is shown if the product 'is "in safe condition and substantially free of defects" . . . .' [Citation.]" (*Ibid*.; *American Suzuki, supra*, 37 Cal.App.4th at p. 1296 [implied warranty does not promise to fulfill buyer's expectations, but provides instead for minimum level of quality].) Thus, a new car need not "be perfect in every detail"; rather, its implied merchantability "requires only that a vehicle be reasonably suited for ordinary use." (*Keegan v. American Honda Motor Co., Inc.* (C.D.Cal. 2012) 838 F.Supp.2d 929, 945.)

Relying on *American Suzuki*, *supra*, 37 Cal.App.4th at p. 1296, Hyundai suggests "the implied warranty of merchantability can be breached only if the vehicle manifests a defect that is so basic it renders the vehicle unfit for its ordinary purpose of providing transportation." As the trial court correctly recognized, however, a

9

merchantable vehicle under the statute requires more than the mere capability of "just getting from point 'A' to point 'B.'"

The court in *Isip v. Mercedes-Benz USA, LLC* (2007) 155 Cal.App.4th 19, 25 (*Isip*), aptly explained that "[t]he above-quoted language in *American Suzuki* was from a much different context . . . . The issue in *American Suzuki* was whether the trial court had properly certified for class treatment the plaintiffs' claims that vehicles they had purchased were prone to rolling over and therefore breached the implied warranty of merchantability. [Citation.] However, because the majority of the plaintiffs' vehicles had not rolled over, the claim was too speculative to warrant class certification. It was in the context of discussing cases in which *no damage had been suffered* that the court wrote that a vehicle violates the implied warranty of merchantability only if the vehicle is unfit for its ordinary purpose of providing transportation. [Citation.]"

Consequently, the court in *Isip* rejected the defendant's suggestion there that a vehicle "*necessarily* does not violate the implied warranty of merchantability" if it can simply "provide[] transportation from point A to point B." (*Isip*, *supra*, 155 Cal.App.4th at pp. 27, italics added.) We agree this notion misstates the law.

Hyundai next relies on *Isip* to suggest a plethora of defects is required before a seller violates the implied warranty of merchantability. Hyundai also suggests it is entitled under *Isip* to multiple repair attempts over an extended period of time before a buyer may rescind under the merchantability warranty. Hyundai summarizes *Isip* narrowly, as follows: "Despite *six* repair attempts, the car continued to have 'malodorous air-conditioning, a leaking transmission, transmission hesitation, and [a] clanking brake problem.' [Citation.] 'A vehicle that smells, lurches, clanks, and emits smoke over an *extended* period of time is not fit for its intended purpose.' [Citation.]" (Hyundai's

10

italics.)  Relying on *Isip*, Hyundai insists that "the *single*, *minor* problem with Brand's sunroof, which was *easily fixable*, was insufficient to support a finding of liability on a breach of implied warranty theory."  (Italics added.)

*Isip*, however, provides just one example of a breach of the implied warranty of merchantability, and does not purport to establish the only manner in which a seller violates the warranty.  To the contrary, an important consideration under the implied warranty is consumer safety.  (*Mexia*, *supra*, 174 Cal.App.4th at p. 1303.)  As *Isip* explained, the implied warranty ensures not simply a product "'substantially free of defects,'" but in particular that "a vehicle . . . is 'in safe condition.'"  (*Isip*, *supra*, 155 Cal.App.4th at p. 27; *Carlson v. General Motors Corp.* (4th Cir. 1989) 883 F.2d 287, 297 [a merchantable vehicle is "'substantially free of defects'" and "'can provide *safe*, reliable transportation,'" italics added].)

This minimum guarantee in the implied warranty of merchantability protects not only the vehicle purchaser, but other motorists, passengers, pedestrians, and the public generally.  Here, a reasonable jury could conclude that a vehicle sunroof that opens and closes *on its own* creates a substantial safety hazard.  Brand described how on the freeway the papers in his car suddenly swirled about in the passenger compartment without notice, creating a dangerous distraction.  We must on appeal from a nonsuit "'"indulg[e] every legitimate inference which may be drawn from the evidence in plaintiff['s] favor."'"  (*Nally*, *supra*, 47 Cal.3d at p. 291.)  A jury therefore reasonably could infer a multitude of similar unsafe scenarios:  a driver suddenly distracted, buffeted, or even incapacitated by unexpected incoming rain, sleet, snow, dust, or blinding sun, or endangered by objects shooting through or out of the cabin.

11

Hyundai contends Brand's safety "argument is specious" because "[i]f open sunroofs rendered cars unfit for their ordinary purpose, then no cars would have sunroofs." The contention is itself specious, however, because it ignores the element of surprise and lack of control that differentiate a properly working sunroof and one that, as Brand describes it, spontaneously creates a gaping, "intermittent hole in your . . . vehicle" "as you are driving down the road." In minimizing the sunroof problem, Hyundai implicitly maintains that its vehicle remained roadworthy in its present condition without any repairs. But a jury reasonably could agree Brand prudently turned the vehicle in immediately because it was not safe for him to continue driving it.[1]

Hyundai suggested for the first time at oral argument that its assertedly successful repair nullified Brand's rescission demand because Hyundai fixed the sunroof before Brand filed his lawsuit. As noted, however, we must view the record most favorably to the plaintiff, and nothing in Brand's evidence established the repair was successful. Hyundai cites no authority that it is entitled to deny rescission and enjoy an open-ended repair window until the plaintiff sues.

Hyundai insists it is entitled to at least 30 days to repair the vehicle, consistent with the period allowed by statute under express warranties. (§ 1793.2, subd. (b).) But clearly established law "reject[s] the . . . argument" that express warranty provisions "concerning replacement or repair of defective goods should be applied" to implied warranty breaches. (*Mocek*, *supra*, 114 Cal.App.4th at p. 407; *Music Acceptance Corp. v. Lofing* (1995) 32 Cal.App.4th 610, 620-621 (*Music Acceptance*).) The Legislature drew the distinction between implied and express warranty remedies, and it is

---

[1]    That is not to say vehicle safety is the sole or dispositive criterion in implied warranty cases, which may turn on other facts.

12

not our province to change it. (*In re Marriage of Tavares* (2007) 151 Cal.App.4th 620, 628 ["The Legislature declares state public policy, not the courts"].)

Simply put, for fundamental defects triggering the statutory implied warranty, the buyer is not required to await a seller's attempt to make repairs (*Mocek*, *supra*, 114 Cal.App.4th at pp. 406-408), and this is particularly true where the seriousness of the defect reasonably undermines the buyer's confidence in the vehicle. (Cf. *id.* at p. 405 [after trailer appliances and breaker panel malfunctioned with "sparks and smoke," buyer testified "'there [was] no way that I would be comfortable that the thing was truly repaired as if it were a brand[] new trailer'"].)

Notably, section 1791.1, subdivision (d), incorporates for a breach of the implied warranty of merchantability the remedies provided in Chapters 6 and 7 of the Commercial Code, but does not similarly incorporate Chapter 5, including Commercial Code section 2508, which affords a seller the opportunity to cure its tender of nonconforming goods in certain circumstances. This omission reinforces that it is the buyer's unilateral right to cancel the contract (§ 1794, subd. (b)(1), citing Com. Code, § 2711 [right to cancel and recover incidental damages, if any]) when a seller provides goods breaching the implied warranty. (*Mocek*, *supra*, 114 Cal.App.4th at p. 407; *Music Acceptance*, *supra*, 32 Cal.App.4th at pp. 620-621.)

Under the Commercial Code, the buyer may reject the goods if they "fail in *any* respect to conform to the contract," (Com. Code, § 2601, italics added), provided the buyer alerts the seller within a reasonable time (*id.*, § 2602). While Hyundai noted below there is no "cooling off" period in which to reconsider an automobile purchase, it remains true that the buyer must have a reasonable opportunity to inspect the goods upon delivery (Com. Code, § 2606, subd. (1)(a)), and the same is true by incorporation under the

13

implied warranty of merchantability (§ 1791.1, subd. (d)). Here, Brand test drove at a different dealership a different Genesis than the one Hyundai ultimately delivered to him. A reasonable jury could conclude the randomly opening and closing sunroof he discovered immediately after delivery was not a minor defect as Hyundai claims, but instead constituted a safety hazard breaching the implied warranty. Even assuming as Hyundai argues that an "easily fixable" problem is not covered by the implied warranty of merchantability, a jury reasonably could conclude Allen's repeated failures to correctly diagnose and repair a safety problem justifiably undermined Brand's confidence in the vehicle, triggering the implied warranty and his right of rescission.

At argument, Hyundai complained of potential unfairness in the year-long implied warranty term. (§ 1791.1, subd. (c); *Atkinson v. Elk Corporation of Texas* (2006) 142 Cal.App.4th 212, 229-231 [breach of implied warranty of merchantability need not be present at delivery, but may occur any time within first year after the sale].) Again, however, the Legislature has established this policy for consumer protection and Hyundai may direct its concerns to that body. We note, in any event, that a buyer's measure of damages for a breach of warranty are calculated at the time the buyer *learns of the breach*. (See § 1794, subd. (b)(1), citing Com. Code, § 2713.) Accordingly, a buyer seeking to repudiate a contract for an asserted warranty breach arising well after sale or delivery is not likely entitled to a full refund and free use of the goods until that point, but rather a damages remedy consistent with the severity of the problem and when it arose, including perhaps a prorated return. These issues are not before us, however, given the defect in Brand's Hyundai was present at the outset and because damages are quintessentially for a jury to resolve, rather than by nonsuit.

14

Hyundai is also mistaken in relying on Allen's service records stating Brand's sunroof either would not open or sometimes opened randomly, but which noted no complaint the sunroof closed spontaneously. On review, we must view the evidence in the light most favorable to the plaintiff. (*Nally*, *supra*, 47 Cal.3d at p. 291.) Brand testified the sunroof opened and closed, both "back and forth" and "without any input." Brand explained the service records inaccurately abbreviated the sunroof malfunction description he gave when he returned the car. The testimony of a single witness is sufficient proof of any fact (Evid. Code, § 411), and a jury therefore could credit Brand's testimony and reasonably infer the service records minimized the defect in his vehicle.

Finally, Hyundai observes that the dealer's service manager, Blacker, "never testified that Brand's vehicle was of different quality as those generally acceptable in the trade, much less that in the trade new vehicles are never sold without similar minor defects." To the extent Hyundai is suggesting nonsuit was proper because Brand did not present evidence on the "passing in the trade" component of the implied warranty of merchantability, the argument has no merit. First, Blacker *did* testify he examined 50 similar Hyundais, none had the sunroof problem, and he acknowledged a vehicle should not be sold with an electrical short in the sunroof. In any event, as noted, the "passing in the trade" and "ordinary fitness" components of the warranty substantially overlap. Moreover, the statutory language expressly states the dual requirements of ordinary fitness and passing without objection in the trade "each" must be satisfied or the product is not merchantable and fails the implied warranty. (§ 1791.1, subd. (a).) Thus, a vehicle that fails to meet *either* requirement is not merchantable, and here a reasonable jury could conclude a randomly opening and closing sunroof presented a dangerous safety flaw.

15

## III

## DISPOSITION

The judgment is reversed and the matter is remanded for proceedings consistent with this opinion.  Appellant is entitled to his costs on appeal.


ARONSON, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


IKOLA, J.

16