Filed 4/30/21  Petrosian v. Mercedes-Benz USA CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| NARINE PETROSIAN, | B299629 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC685538) |
| v. | |
| MERCEDES-BENZ USA, LLC, et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Lia Martin, Judge.  Affirmed.

Universal & Shannon, Jon D. Universal, James P. Mayo, Nejla Nassirian; Weinberg Wheeler Hudgins Gunn & Dial, Gary J. Toman for Defendants and Appellants.

The Bravo Law Firm, Nicholas A. Bravo; Law Office of Adam Zolonz, Adam Zolonz for Plaintiff and Respondent.

_____

Respondent Narine Petrosian purchased a used vehicle from Keyes European, a car dealership, which was manufactured by Mercedes-Benz USA (collectively Mercedes).  She later demanded pursuant to the Song-Beverly Consumer Warranty Act that Mercedes-Benz repurchase the car, claiming it had a chronic engine clatter that Keyes was unable to fix.  Mercedes-Benz declined to repurchase the car and Petrosian filed this lawsuit, alleging Mercedes willfully violated its obligations under the act.  The jury found in favor of Petrosian.  Mercedes contends insufficient evidence supported the verdict in several respects, and the trial court made numerous prejudicial errors.  We affirm.

## BACKGROUND

As this matter is before us on appeal from a judgment in favor of Petrosian after a jury trial, we view the evidence in favor of the judgment.  (*Roby v. McKesson Corp*. (2009) 47 Cal.4th 686, 694.)

### A.     Vehicle Function

On August 5, 2015, Petrosian purchased a certified pre-owned 2013 Mercedes-Benz S-550 with 17,706 miles on it from Keyes European dealership for $76,116.88.  The vehicle came with an original factory warranty through February 2017, and also a second warranty of one year beginning at the expiration of the original factory warranty.  The terms of these warranties were not made part of the record at trial, and so far as we can tell do not appear in the record on appeal.

Most interaction with the dealer was by Petrosian's father, Jack Petrosian, who was the car's primary operator, referring to it at trial as "my car."  (We will refer to Narine as "Petrosian" and her father as "Jack Petrosian.")  During the test drive prior to purchase, Jack Petrosian inquired why the car made a rattling

2

noise on cold startup. The salesman informed him the noise was normal for that vehicle.

The day after the purchase, and again a week after that, August 7 and 13, 2015, Jack Petrosian presented the vehicle with complaints that a rattling noise came from the engine at cold startup, lasting approximately half a minute. Keyes was unable to verify the noise because the car had warmed up on the trips to the dealership, and generated no repair order document for these visits.

More than a year after the purchase, Jack Petrosian presented the vehicle to Keyes five more times.

On October 6 and 10, 2016, he again complained of the engine rattling noise. Keyes replaced the battery on October 6 and the timing chain tensioner and check valve (another chain tensioning part) on October 10, 2016.

On October 22, 2016, Keyes replaced a leaking washer fluid holder.

On July 7, 2017, Jack Petrosian again complained about the rattling noise, and Keyes again replaced the timing chain tensioner. Jack also complained about a suspension noise, which the dealer was unable to duplicate and did not remediate. Finally, he complained about a stuck sun shade, which he decided not to have repaired because Keyes represented it was not covered by the warranty. That problem eventually resolved itself.

On August 24, 2017, Jack Petrosian again complained about the engine rattling noise, which Keyes addressed by replacing the timing chain tensioner (for the third time) and camshaft adjuster. Jack also complained about an engine

3

vibration, which Keyes addressed by replacing the engine and transmission mounts.

The rattling noise was never fixed, and existed when the parties' experts inspected the vehicle in December 2018.

In late 2017, Petrosian submitted a claim to Mercedes for repurchase of the vehicle, which was denied.

## B.    Litigation

On December 4, 2017, Petrosian sued Mercedes-Benz and Keyes, asserting causes of action for breach of express warranty and breach of the implied warranty of merchantability. She alleged the vehicle was expressly warranted to be free from defects in material and workmanship, but had significant mechanical and electrical problems, and Mercedes-Benz willfully breached the warranty by refusing in bad faith to repurchase the car. Petrosian sought replacement of the car or restitution plus civil penalties under the Song-Beverly Consumer Warranty Act (also known as the California Lemon Law), Civil Code section 1790 et seq.

During discovery, Mercedes propounded form interrogatories asking for identification of any persons with knowledge of the incident. Petrosian first answered "N/A," but upon further request amended her answer to disclose herself and her mother—but not Jack Petrosian—as having knowledge of the car's defects.

At trial, documents revealed that the prior owner had made several calls for roadside assistance, had needed four battery jump starts, on July 1 and December 20, 2013, June 9, 2014, and June 4, 2015, and had replaced the battery at 4,000 miles. The vehicle had also produced "low-voltage" fault codes in dozens of control modules, indicating electrical components were receiving

4

insufficient voltage.  The car also experienced low-voltage fault codes over several modules when Petrosian owned it, and Petrosian had had to replace the battery again.

Jack Petrosian testified he regularly drove the vehicle, referring to it several times as "my car."  He took it to Keyes the day after Petrosian bought it, and a week after that, both times complaining about the rattle, but Keyes told him the noise was normal and would go away.  Petrosian then left without demanding that it be repaired.  Mercedes contended these visits never occurred.

Narine Petrosian testified she never drove the car more than five or 10 miles, but Jack Petrosian was the usual driver, "so he experienced all the problems more than [she] would."  She testified that she did not feel safe driving the car, and that it sat in the driveway for "days and months and weeks."  She would take it out "once in a while" "[j]ust to see if it's still the same problem."

A video recording of the engine was played for the jury.  Clark Bauman, Mercedes's expert, testified that the rattling noise it made on cold startup was normal, but Thomas Lepper, Petrosian's expert, testified it was "quite clearly" abnormal.

Lepper, who had worked on cars extensively for 50 years, including professional race cars, testified that the Mercedes-Benz S-550 was a world-class luxury car, "typically one of the best vehicles in the world," and with one exception was the "biggest, most comfortable, most featured, most prideful car they make," with a listing price starting at $90,000.

The rattling noise was a known problem at Mercedes-Benz, which had issued a "technical service bulletin" (TSB) titled "Rattling Noise After Engine Starts for Several Seconds."  The

TSB informed all Mercedes-Benz distributors that the problem could be resolved by replacing the timing chain tensioners and installing a check valve.  Lepper testified that TSBs for a vehicle will appear on a dealer's service technician's computer when the vehicle's VIN number is entered.

Lepper identified elements of the engine noise heard by the jury:  "You heard the starter go and the engine start to turn, and you heard that hammering sound when the engine first started cold, as the oil pumped up, established pressure in the chain tensioners, and pulled everything taut.  [¶]  And you heard probably the first just four or five seconds of that hammer that is the objectionable noise that's telling us there's a problem in that engine.  It's not maintaining that proper pressure to hold that timing chain and everything in the proper alignment."

Lepper testified that the noise was caused by insufficient oil pressure to the timing chain tensioners.  The Mercedes-Benz S-550 has a V-8 engine with four camshafts, which rotate when the engine runs, "timing" the intake and exhaust valves by pushing on and releasing them in sync with the pistons.  A camshaft is turned by a chain, called the timing chain.  The timing chain must remain taut, as a loose chain could jump teeth on the sprocket, possibly causing catastrophic engine failure, with pistons colliding with valves, piston rods exploding through the engine casing, and engine oil spraying the engine compartment, with an outside chance of oil landing on a hot catalytic converter and causing a fire.  A loose timing chain may rattle against the metal housing enclosing the system, and can lead to reduced fuel efficiency, increased engine wear, and damage to other components.

A timing chain is kept taut by a hydraulic timing chain tensioner, which requires oil pressure to function. Oil pressure is lowest at cold startup but quickly increases as the engine operates. A check valve operates to help maintain oil pressure.

At higher speeds the camshaft must activate valves slightly earlier than at lower speeds for better power production. The camshaft adjuster accomplishes this by "advancing" the camshaft's rotation slightly. It too requires oil pressure to function.

Lepper testified there was no reason to replace the timing chain tensioners three times—on October 10, 2016 and July 7 and August 24, 2017—without giving some explanation why prior repairs did not work, for example because the repair parts were defective or the first mechanic made a mistake. That none of the repairs fixed the problem, which persisted even after Keyes replaced the camshaft adjuster in August 2017, indicated the problem resided somewhere else, although Lepper could not diagnose exactly where.

Lepper testified that examination of past as well as present electrical faults was necessary to understand the vehicle's condition as a whole. Four "quick tests" (basically snapshots of the vehicle's error code system) from 2013 to 2018 showed that the vehicle produced dozens of reappearing undervoltage error codes "all over th[e] car." The car required a new battery at 4,000 miles and another one on October 6, 2016, and the prior owner had called Mercedes's roadside assistance number four times to request jump starts.

Lepper testified that an S-Class Mercedes requiring four jump starts in its first two years was unacceptable "in any way," and its history of electrical fault codes both before and after two

batteries were replaced indicated that the car's continuing low-voltage codes could not be attributed to the battery.  He testified, "This [many] problems, this many presentations, this many service issues, tells me there's a real problem in that wiring harness in that car, and that's just unacceptable.  [¶]  Again, this is an S-Class Mercedes.  Four, maybe five jump-starts that we've documented, numerous batteries, short tests that show failures all over the place, that's not right and not normal."  Lepper testified that the car exhibited "problem after problem.  The same problems exhibiting.  There's no question here this was bad from day one."

Lepper opined that it was unreasonable for Mercedes's technicians not to proactively test the vehicle for faults when it was in their possession, to repeat repairs that did not work, and to fail to look for deeper causes.  He testified that the technicians knew about the car's electrical problems:  "They knew it.  Once they put the VIN number in their computer system, the last service history comes up, and it will show you the last few times it's been in, and the technician or the service writer can check and see, 'Why does this car keep coming in?'  [¶]  'Oh, my.  Here's another battery.'  [¶]  All this is known stuff.  This is not a secret or something they didn't know because it was somewhere else."  He testified, "I'm not going to accept anybody saying 'We didn't know,' because it's been brought in to Keyes over and over and over through most of this vehicle's life."  He testified, "Why didn't the tech say, 'I got some problems here, boss.  Give me some time to work on this'?  [¶]  Someone should have said here, 'Here's a repeated problem.  Here's a current problem.  Let me fix this.'  It's kind of how they earn their living, right?  The dealership."

Lepper testified that it was unreasonable for the number of repairs performed not to have fixed the car's issues, and the unresolved issues impaired its value. He concluded that the "continuing electrical problems" and, independently, the "continuing engine problems have substantially impaired the safety of the vehicle" and "affected the use of the vehicle, partly because it's been in the shop so many days and partially because the Petrosians have restricted their use of it because they're not comfortable with the way that car has performed and failed on them."

Mario Haro, Mercedes's customer care manager, testified that he received Petrosian's request for repurchase of the vehicle along with the repair records, but declined to consider records generated by the prior owner. Haro denied Petrosian's claim on the ground that the car did not have a defect that substantially impaired its use, value or safety, which was not repaired after a reasonable number of attempts.

The jury found defendants liable, and awarded Petrosian $73,015.12 (equal to the purchase price less a mileage offset) plus a $76,116.88 civil penalty for willful breach of the express warranty, and $76,116.88 for breach of implied warranty.

Mercedes moved to vacate the judgment and moved for a new trial and for judgment notwithstanding the verdict (JNOV). The court granted the motion to vacate in part, finding the breach of express and implied warranty awards to be duplicative. It therefore vacated the award for breach of implied warranty but otherwise denied defendants' motions, entering judgment for Petrosian in the amount of $149,132.

9

## DISCUSSION

### A. Breach of Express Warranty

Mercedes contends the judgment must be reversed with directions to enter judgment in its favor because no evidence demonstrated that the car suffered a defect that substantially impaired its use. We disagree.

#### 1. Legal Principles

The Song-Beverly Consumer Warranty Act obligates a manufacturer or its representative to service or repair a new car to conform with applicable express warranties within a reasonable number of attempts. (Civ. Code, § 1793.2, subd. (d)(2).)[1] If the manufacturer fails to do so, it must either replace the car or make restitution to the buyer. (*Ibid.*) A used vehicle sold during the period of a transferrable new vehicle warranty is a new vehicle for purposes of the Song-Beverly Act. (*Jensen v. BMW of North America, Inc.* (1995) 35 Cal.App.4th 112, 123.)

A nonconformity requiring a vehicle's refund or replacement must " 'substantially impair the use, value, or safety' " of the vehicle. (*Johnson v. Ford Motor Co.* (2005) 35 Cal.4th 1191, 1211; see also *Lundy v. Ford Motor Co.* (2001) 87 Cal.App.4th 472, 478.) "Whether the impairment is substantial is determined by an objective test, based on what a reasonable person would understand to be a defect. [Citations.] This test is applied, however, within the specific circumstances of the buyer." (*Lundy*, at p. 478.)

"Where findings of fact are challenged on a civil appeal, we are bound by the 'elementary, but often overlooked principle of

---

[1] Undesignated statutory references will be to the Civil Code.

law, that . . . the power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the findings below." [Citation.] We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor . . . ." (*Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660.) A judgment supported by substantial evidence will be upheld even if contrary evidence exists that might have caused the jury to render a different verdict. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.) Substantial evidence is evidence of ponderable legal significance, reasonable, credible and of solid value. (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633.) The "judgment . . . is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness." (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133.)

  2. Application

 Here, Lepper testified that Petrosian's vehicle suffered persistent and substantial mechanical and electrical defects that damaged the battery, produced dozens of undervoltage faults, caused a "hammering sound" when the engine was started cold, and threatened to reduce performance, damage other components, and possibly cause a catastrophic engine failure. Petrosian testified she and her father would leave the car in the driveway unused, driving it only occasionally to see if the rattling noise had gone away. From this evidence the jury could reasonably conclude the car suffered a defect that substantially impaired the use, value, and safety of the vehicle.

11

Mercedes argues that substantial impairment must exist from the buyer's perspective, not from that of someone else, and evidence that Jack Petrosian primarily drove the car and took it in for repairs failed to show the car was defective from Narine's perspective. The argument is without merit. A loud hammering noise in a world-class luxury car is defective from anyone's perspective.

Mercedes argues without citation to authority that Petrosian was required to establish the precise terms of the warranty in order to show that the car failed to conform to the warranty, and her failure to do so necessitates that the judgment for breach of express warranty be reversed. The argument is without merit. To establish a warranty claim a plaintiff need only prove the substance of the warranty's relevant terms. (See *McKell v. Washington Mutual Inc.* (2006) 142 Cal.App.4th 1457, 1489.) Here, it was undisputed at trial that the car was covered by an express warranty that covered defects in parts and workmanship. Lepper testified that the car's timing chain tensioning system and core electrical systems were defective. This sufficed. Mercedes adduces no evidence, and does not claim, that the timing chain and electrical systems were not covered by the warranty.

Mercedes argues the car's defects cannot be deemed under an objective standard to have substantially impaired the car's use, value, or safety because the start-up noise was normal and lasted only a few seconds, and the Petrosians never noticed the low-voltage errors, which manifested only in a bad battery that was promptly replaced as a normal maintenance item. This argument flatly ignores Petrosian's evidence supporting the judgment. Lepper testified that the noise was *not* normal, but

indicated a deeper mechanical problem, and the low-voltage errors and dead battery were symptomatic of an overarching electrical problem infecting dozens of the car's components. We have no power on appeal to recharacterize the evidence in opposition to the judgment.

Mercedes argues without citation to authority that to establish the amount of restitution owed under section 1793.2, subdivision (d)(2)(B), Petrosian had to establish the current pay-off amount owed to the lender, Mercedes-Benz Financial Service. Petrosian's adducing no evidence of this amount, Mercedes argues, necessitates that the restitution award be vacated. The argument is without merit.

"In the case of restitution, the manufacturer shall make restitution in an amount equal to the actual price paid or payable by the buyer . . . ." (§ 1793.2, subd. (d)(2)(B).) The jury awarded Petrosian the purchase price less an offset for usage of the vehicle. Evidence of the purchase price, which was undisputed, established the amount of restitution owed. No evidence suggested that the amount "payable" would be less than the purchase price. For example, Mercedes adduced no evidence that Mercedes-Benz Financial Service offered to discount or forgive part of Petrosian's car loan.

Citing only its own evidence and entirely disregarding Petrosian's, Mercedes argues insufficient evidence supported the civil penalty because no evidence established that it breached the express warranty willfully as opposed to denying her claim reasonably and in good faith. We disagree.

A buyer of consumer goods who is damaged by a manufacturer's failure to comply with its obligations under the Song-Beverly Act may recover a civil penalty of up to two times

13

the amount of actual damages "[i]f the buyer establishes that the failure to comply was willful." (§ 1794, subd. (c).) A manufacturer's "failure to refund or replace [is] not willful if it reasonably and in good faith believed the facts did not call for refund or replacement." (*Kwan v. Mercedes-Benz of North America, Inc.* (1994) 23 Cal.App.4th 174, 186.)

Here, Lepper testified at length that Mercedes knew the vehicle was defective but took no steps to repair the electrical system or seek the cause of the rattling noise. Haro testified that he reviewed the repair history insofar as Petrosian owned the car, but declined to review any record predating the dealer's "certifying" inspection prior to its reselling the vehicle, thereby precluding any opportunity to observe most of the vehicle's history of electrical defects. This evidence was substantial, and supported the jury's conclusion that Mercedes did not reasonably and in good faith believe that the facts called for no refund or replacement.

## B.    Breach of Implied Warranty

Mercedes argues insufficient evidence supported Petrosian's claim for breach of implied warranty. We disagree.

"[E]very sale of consumer goods that are sold at retail in this state shall be accompanied by the manufacturer's and the retail seller's implied warranty that the goods are merchantable. (§ 1792.) The warranty arises by operation of law." (*Mega RV Corp. v. HWH Corp.* (2014) 225 Cal.App.4th 1318, 1330; see also *American Suzuki Motor Corp. v. Superior Court* (1995) 37 Cal.App.4th 1291, 1295 (*American Suzuki*).) Merchantability means that the goods are "fit for the ordinary purposes for which such goods are used." (§ 1791.1, subd. (a)(2).) Such fitness is shown if the product "is 'in safe condition and substantially free

14

of defects.' " (*Isip v. Mercedes-Benz USA, LLC* (2007) 155 Cal.App.4th 19, 27.)

A buyer may bring a civil action for damages incurred due to breach of this implied warranty. (§ 1794, subd. (a); *Brand v. Hyundai Motor America* (2014) 226 Cal.App.4th 1538, 1545 (*Brand*).)

Here, the same evidence establishing that Petrosian's car suffered defects that substantially impaired its use, value, and safety established that it was not in a safe condition and substantially free of defects, and therefore was not "fit for the ordinary purposes for which such goods are used." (§ 1791.1, subd. (a)(2).) The ordinary purpose for which a high-end luxury car is used is to drive safely in luxury. The jury could reasonably have concluded that one cannot safely drive in luxury a car which exhibits a "hammering" rattle on startup, which suffers an unremediated timing chain problem that could lead to catastrophic engine failure, or which suffers electrical problems that could lead to damaged batteries, power accessories failing, or an unusually high number of calls for roadside assistance.

Quoting *Brand*, *supra*, 226 Cal.App.4th 1538, *Lee v. Toyota Motor Sales, U.S.A., Inc.* (C.D.Cal. 2014) 992 F.Supp.2d 962 (*Lee*), and *American Suzuki*, Mercedes argues that a merchantable vehicle need only " ' "provide safe, reliable transportation" ' " (*Brand*, at p. 1547), and the implied warranty of merchantability is breached only if the vehicle fails to provide "a minimum level of quality," i.e., suffers a defect that renders it "[un]fit for driving" (*Lee*, at p. 980; *American Suzuki*, *supra*, 37 Cal.App.4th at p. 1295). We disagree.

First, Mercedes neglects to honor *Brand*'s italicization of the word "safe," holding that a merchantable vehicle must

15

" ' "provide *safe*, reliable transportation." ' " (*Brand*, *supra*, 226 Cal.App.4th at p. 1547.) *Brand* held that a sunroof that opens and closes by itself could alone render a car unmerchantable, because "a reasonable jury could conclude that a vehicle sunroof that opens and closes on its own creates a substantial safety hazard," in that it could infer "a driver suddenly distracted, buffeted, or even incapacitated by unexpected incoming rain, sleet, snow, dust, or blinding sun, or endangered by objects shooting through or out of the cabin." (*Ibid*.) Here, Lepper testified that the timing chain defect could cause catastrophic engine failure while the car was being driven, which could lead to sudden loss of power, with an outside chance of a fire caused by engine oil landing on a hot catalytic converter. Based on this testimony, the jury could reasonably infer a driver suddenly distracted at speed by an engine explosion and fire.

The *Lee* court found that the plaintiffs could not allege the supposed defect actually resulted in any failure or that "they stopped using their vehicles." (*Lee*, *supra*, 992 F.Supp.2d at p. 980.) Here, in contrast, Lepper testified that the defect actually caused the timing chain to rattle against its housing and could lead to serious consequences, and Petrosian testified she had stopped driving the car.

In *American Suzuki* the plaintiffs sought class treatment of claims that vehicles breached the implied warranty of merchantability simply by being prone to rolling over, even though only a small minority of the plaintiffs' vehicles had rolled over. (*American Suzuki*, *supra*, 37 Cal.App.4th at p. 1298.) The court held that in the context of vehicles having suffered no damage, a breach of implied warranty was too speculative to warrant class certification because "the vast majority" of the

16

Suzuki vehicles " 'did what they were supposed to do for as long as they were supposed to do it.' " (*Ibid*.)  The instant case, unlike *American Suzuki*, is before us after trial upon a set of facts supporting a finding of two serious vehicle defects, and does not turn on whether the damage is too speculative to support class treatment.

Therefore neither *Brand* nor *Lee* nor *American Suzuki* stands for the proposition that all a merchantable luxury vehicle need do is get the driver from point A to point B.  (See *Isip v. Mercedes-Benz USA, LLC*, *supra*, 155 Cal.App.4th at p. 27 ["We reject the notion that merely because a vehicle provides transportation from point A to point B, it necessarily does not violate the implied warranty of merchantability.  A vehicle that smells, lurches, clanks, and emits smoke over an extended period of time is not fit for its intended purpose"].)

Mercedes argues Petrosian adduced no evidence of a defect that affected the vehicle's "reliability, safety, or drivability."  But one would have to ignore the bulk of Petrosian's evidence to so conclude.

Mercedes rebuts Lepper's testimony point by point with that of Bauman, its own expert, styling Lepper's evidence as speculative.  We disagree and are neither free nor inclined to reweigh the evidence.

Mercedes argues Petrosian failed to establish a breach of the implied warranty during the warranty period because she failed to take the vehicle in for repairs until more than a year after the purchase.  We disagree.

The "duration of the implied warranty of merchantability . . . shall be coextensive in duration with an express warranty which accompanies the consumer goods,

17

provided the duration of the express warranty is reasonable; but in no event shall such implied warranty have a duration of less than 60 days nor more than one year following the sale of new consumer goods to a retail buyer.  Where no duration for an express warranty is stated with respect to consumer goods, or parts thereof, the duration of the implied warranty shall be the maximum period prescribed above." (§ 1791.1, subd. (c).)

"The implied warranty of merchantability may be breached by a latent defect undiscoverable at the time of sale.  [Citations.]  Indeed, '[u]ndisclosed latent defects . . . are the very evil that the implied warranty of merchantability was designed to remedy.'  [Citation.]  In the case of a latent defect, a product is rendered unmerchantable, and the warranty of merchantability is breached, by the existence of the unseen defect, not by its subsequent discovery." (*Mexia v. Rinker Boat Co., Inc.* (2009) 174 Cal.App.4th 1297, 1304-1305 (*Mexia*).)

The statute of limitations for an action for breach of warranty under the Song-Beverly Act is four years after the cause of action has accrued.  (*Mexia, supra*, 174 Cal.App.4th at pp. 1305-1306.)  "A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach.  A breach of warranty occurs when tender of delivery is made . . . ." (*Id.* at p. 1306.)

Here, Petrosian testified that the timing chain defect existed when she purchased the car, and Lepper testified that both the electrical and timing chain defects existed at that time.  That Petrosian did not know about the electrical defect or seek repair of the timing chain defect does not mean they were nonexistent.  The Song-Beverly Act "does not create a deadline

18

for discovering latent defects or for giving notice to the seller." (*Mexia*, *supra*, 174 Cal.App.4th at p. 1301.)

Mercedes argues Petrosian produced no "competent evidence that any defect rendering the vehicle unmerchantable existed during the durational period." But again, one would have to ignore most of her evidence to draw such a conclusion.

## C.     Admission of the Testimony of Jack Petrosian

Narine and Jack Petrosian both testified that Jack was the primary driver of the vehicle and experienced most of its defects, yet when asked in an interrogatory to identify anyone with knowledge of the "incident," i.e., the facts giving rise to the complaint, Petrosian named only herself and her mother. Mercedes moved in limine to exclude any undisclosed witnesses from presenting evidence at trial. Petrosian, apparently recognizing that the generic motion would pertain to Jack Petrosian's testimony, opposed the motion on the ground that Petrosian's identity was "readily known" to Mercedes, as his name and phone number were listed on numerous repair records. He was therefore "not a secret witness," Petrosian argued, Mercedes had simply made a deliberate litigation choice not to depose him. Petrosian argued that exclusion of Jack's testimony would "irreparably prejudice" Petrosian's claim.

The trial court at first deferred ruling on the motion, stating no party was to "mention or refer to the contested item of evidence . . . without first being granted permission by the court."

Mercedes renewed its objection to admission of testimony by Jack Petrosian, both on the day before trial and during an interruption in his testimony. Petrosian opposed the objection, again arguing that Jack Petrosian was known to Mercedes because he presented the car five times for repair and was

"identified on every single repair record." The trial court denied the motion to exclude him, giving no explanation.

Mercedes argues the court improperly admitted Jack Petrosian's testimony, which rendered the trial fundamentally unfair. Although we certainly do not condone Narine Petrosian's failure to disclose Jack's identity as a person with knowledge, we need not determine whether admission of his testimony was error because even if the court had excluded his evidence, there is no reasonable probability the verdict would have been different.

"A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless . . . the error or errors complained of resulted in a miscarriage of justice." (Evid. Code, § 353.) An evidentiary error results in a miscarriage of justice when the reviewing court, " 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

Here, Jack Petrosian's main contribution was that he complained about the engine rattle the day after purchase, and a week after that, which supported Narine's claim that she presented the vehicle for repair within the 90-day implied warranty term. But as discussed above, to do so was unnecessary because the testimony of both Narine Petrosian and Lepper established that both the electrical and timing chain defects existed when Petrosian purchased the car, and defendant's own records demonstrated the car's electrical faults. Jack Petrosian's testimony was therefore cumulative, and no reasonable

20

probability exists that its exclusion would have changed the verdict.

## D.    Trial Conduct

Mercedes contends the trial was infected by numerous errors that manifestly prevented a fair trial and amounted to a miscarriage of justice.  It argues the trial court unfairly and arbitrarily limited the defense case-in-chief and closing arguments; scheduled the start of the trial on a date when defense counsel had multiple conflicts; permitted Narine Petrosian to introduce evidence of prior owner records for the vehicle; instructed the jury that it need not return to complete the trial; prepared an erroneous special verdict form over a defense objection; improperly denied an instruction as to lack of maintenance; and provided the jury with erroneous instructions, including a series of "special instructions" prepared by Petrosian as to which Mercedes was not permitted to object.

### 1.    Time Limitations

Mercedes argues that the trial "covered eight days," of which Mercedes was allotted only two and one half hours for its case-in-chief.  It argues this unfair and arbitrary time limitation was insufficient, and compromised its fundamental right to present its case fully.

Administration of trials is within the sound discretion of the trial court (*In re Ryan N.* (2001) 92 Cal.App.4th 1359, 1385), and a judgment will be set aside only when errors result in a miscarriage of justice (Cal. Const., art. VI, § 13).  " ' "[A] 'miscarriage of justice' should be declared when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the

21

absence of the error." ' " (*Linton v. Desoto Cab Company, Inc.* (2017) 15 Cal.App.5th 1208, 1224.)

Here, Mercedes presents insufficient information for us to review its contention that the time allotted was insufficient. At the final status conference the parties agreed to take each witness only once and treat him or her as a cross-witness for each side. Mercedes indicated it intended to call "at least" five witnesses, namely Petrosian, Lepper, Bauman, Haro, and Andrew Campa, Keyes's service manager. Mercedes called these witnesses, and only one other witness—Jack Petrosian—was called by either side.

Mercedes offers no citations to the record to show what time was given, why more was needed, what other witnesses it wished to call, or what objections it raised to any time limit. And other than arguing that the time allotted was "plainly" insufficient, Mercedes makes no attempt to explain what more evidence it could have produced to change the verdict. We therefore have no basis upon which to conclude that eight trial days were insufficient to examine six witnesses.

Nor do we apprehend, nor does Mercedes explain, why 12 and a half minutes per side was insufficient for closing argument. Trial courts "have broad discretion to control the duration and scope of closing arguments." [Citation.] [¶] We review a trial court's decision to limit defense counsel closing argument for abuse of discretion." (*People v. Simon* (2016) 1 Cal.5th 98, 147.) Mercedes making no attempt to explain what more it could have done after 12 and a half minutes of closing argument, we have no basis to conclude the trial court abused its discretion.

## 2. Trial Date

The record is similarly deficient for Mercedes's claim that the trial date inconvenienced its attorney. Mercedes argues that the court set a date for trial that conflicted with his attorney's participation in unspecified "other trials" in Orange County, which "significantly affected" the attorney's trial preparation in this matter. Absent some further explanation, however, we cannot find the court abused its discretion in refusing to accommodate counsel's calendar.

## 3. Evidence of Prior Owner Records

Without citation to authority, Mercedes argues the trial court abused its discretion in admitting of certain repair records of the vehicle's prior owner, which it argues were irrelevant. We disagree. Lepper testified that a review of prior repair records was necessary to determine the nature of the present electrical defect. The records also demonstrated Mercedes's awareness of potential problems with the vehicle at the time of sale.

## 4. Special Verdict Form

Again citing no authority, Mercedes argues the court erred in sending to the jury a verdict form that quoted the language of section 1793.2, subdivision (d)(2)(B) as follows: "Question No. 6: What are Narine Petrosian's damages? Calculate as follows: [¶] (a) Damages including the actual price paid or payable by the buyer, including charges for transportation and manufacturer installed items, but excluding nonmanufacturer items installed by a dealer or the buyer, and including any collateral charges such as sales or use tax, license fees, registration fees and other official fees." Mercedes argues this caused the jury to award improper cost items such as unpaid finance fees and $895 for an optional surface protection product.

23

Subdivision (d)(2)(B) of section 1793.2 provides in pertinent part the following: "In the case of restitution, the manufacturer shall make restitution in an amount equal to the actual price paid or payable by the buyer, including any charges for transportation and manufacturer-installed options, but excluding nonmanufacturer items installed by a dealer or the buyer, and including any collateral charges such as sales or use tax, license fees, registration fees, and other official fees . . . ."

It is unclear, and Mercedes fails to explain, how a jury instruction that quotes subdivision (d)(2)(B) of section 1793.2 nearly verbatim could be an improper statement of the law. It is also unclear how a verdict form that instructs the jury not to award damages for nonmanufacturer items installed by the dealer caused the jury to award $895 for a nonmanufacturer item installed by the dealer. To the extent, as Mercedes argues, the jury simply and incorrectly awarded Petrosian the purchase price, which itself included improper charges, nothing suggests that the verdict form caused this error.

5.      Instruction to the Jury that it Need Not Return

At the conclusion of testimony on March 12, 2019, the court advised the jury that although it had not discharged them, since they were previously told the trial would end that day and it had not yet completed, it was up to them to decide whether they would return the following day to continue with the trial. All the jury opted to return. Mercedes argues it was prejudicial error to instruct the jury it need not return. We agree that any suggestion that the jury need not return would have been error, but as the jury in fact did return, the error caused no prejudice.

24

6.     Jury Misconduct

Mercedes argues without citation to the record that the jury returned the verdict before the court answered a question the jury had posed:  "How do we calculate damages under Question 4 for Breach of Implied Warranty?"  No authority of which we are aware obligates a jury to await an answer to one of its questions before rendering a verdict.  In any event, because the trial court vacated the implied warranty award, the issue is moot.

7.     Instruction as to Lack of Maintenance

During the trial, Bauman testified that the vehicle was 351 days past due on "maintenance," referring to a photo he took during his inspection of the vehicle's dashboard cluster on December 11, 2018, which reflected a message that the vehicle was 351 days past due on maintenance.  The court refused to admit the photo on relevancy grounds, and refused to instruct the jury on the issue of lack of maintenance as a possible cause for the vehicle's defects.  Mercedes argues this constituted prejudicial error.  We disagree.

A vehicle's maintenance schedule covers all maintenance points, including such things as inspection and replacement of brake fluid and cabin filters.  Absent some indication what maintenance was missed, if any, the jury had no basis upon which to conclude lack of maintenance contributed to the vehicle's defects.

8.     Special Jury Instructions

The court gave the jury eight special jury instructions proposed by Petrosian.  All pertained to issues discussed above, and Mercedes argues each represented a misstatement of the law for reasons we have rejected above.  Mercedes contends it had no

opportunity to object to the instructions.  However, Mercedes's only citation to the record supporting this contention reflects only that its attorney claimed he had no opportunity "today" to "address" the instructions.  The record reflects that Petrosian's counsel shared the instructions with defense counsel on December 28, 2018, three months before trial.  Therefore, Mercedes had ample time to object to them, but did not do so.

**E.    Conclusion**

For the reasons discussed above, the judgment is affirmed.

**DISPOSITION**

The judgment is affirmed.  Respondent is to recover her costs on appeal.

NOT TO BE PUBLISHED

CHANEY, J.

We concur:

BENDIX, Acting P. J.

FEDERMAN, J.[*]

---

[*] Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.